IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**RUBY CORADO**<br>(a/k/a "Ruby Jade Corado" and<br>"Vladimir Orlando Artiga Corado")<br><br>Defendant. | **Criminal No.**<br><br>**Magistrate No. 24-MJ-81 (RMM)**<br><br>**VIOLATION:**<br>18 U.S.C. § 1343 (Wire Fraud)<br><br>**FORFEITURE:**<br>18 U.S.C. § 981(a)(1)(C),<br>28 U.S.C. § 2461(c), and<br>21 U.S.C. § 853(p) |

### INFORMATION

The United States Attorney charges that, at times relevant to the charged offense:

### Introduction

1.  Defendant RUBY CORADO (a/k/a "Ruby Jade Corado" and "Vladimir Orlando Artiga Corado") was born in El Salvador and is a lawful permanent resident of the United States.

2.  On February 12, 2004, CORADO registered Casa Ruby, Inc. ("Casa Ruby") in the District of Columbia. CORADO was the only governor and the only beneficial owner of Casa Ruby. Casa Ruby had multiple bank accounts with Manufacturers & Traders Trust Company ("M&T Bank"). CORADO opened one of those accounts (x4601) at a branch of M&T Bank in Washington, D.C., on May 17, 2019. Casa Ruby effectively ceased operations in the District of Columbia in approximately July 2022.

3.  Casa Ruby claimed to provide the following services: (a) to provide housing services for homeless LGBTQ+ youth including transitional housing; (b) to assist LGBTQ+ immigrants and connect them to attorneys; (c) to provide social services such as case management and therapeutic mental health support for survivors of violence, and (d) to assist with a wide array

of services such as assisting with passport applications and certain visa applications. Casa Ruby's website (www.casaruby.org) stated that Casa Ruby employed over 50 people and provided more than 30,000 social and human services to more than 6,000 people each year. At various times, Casa Ruby operated multiple shelters in Washington, D.C., that provided transitional housing.

4. On February 13, 2019, CORADO registered TIGloballogistics, LLC ("TIGlobal"), as a limited liability company in the District of Columbia. TIGlobal provided consulting services separate from Casa Ruby. CORADO was the only beneficial owner of TIGlobal. In February 2019, CORADO opened a bank account (x0394) in the name of TIGlobal at M&T Bank. CORADO was the only signatory on TIGlobal's account x0394. In January 2021, CORADO opened a second bank account (x9064) in the name of TIGlobal at M&T Bank. CORADO was the only signatory on TIGlobal's account x9064. On January 23, 2021, CORADO registered "Casa Ruby Pharmacy" as a trade name for TIGlobal.

5. DocuSign, Inc., was a company headquartered in San Francisco, California, that provided electronic signature services. DocuSign's services are used by both government agencies and private corporations to simplify the process of executing documents for signature. DocuSign users can sign practically any type of agreement on almost any device.

**Pandemic Relief Programs**

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses, through a loan program referred to as the Paycheck Protection Program ("PPP").

7.  In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application, which was signed by an authorized representative of the business. The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant had to state, among other things, its: (a) average monthly payroll expenses and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses. To qualify for eligibility, businesses applying for a PPP loan needed to be in operation as of February 15, 2020. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA on the loan application or any misapplication of loan proceeds could result in sanctions, including criminal penalties.

8.  A PPP loan application was required to be processed by a participating financial institution (each a "lender"). If a PPP loan application was approved, then the lender funded the PPP loan using its own monies, which were 100% guaranteed by the Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan.

9.  PPP loan proceeds were required to be used by the receiving business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP program allowed the interest and principal on a PPP loan to be entirely forgiven if the receiving business spent the loan p roceeds on permissible expenses within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

10. In or around December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act (the "Economic Aid Act") provided additional funding for the PPP and extended the application deadline to March 31, 2021. The Economic Aid Act enabled borrowers to take a second draw PPP loan under the same general terms as their first PPP loan, up to a maximum loan amount of $2 million. The Economic Aid Act reopened the PPP loan program to borrowers who did not previously receive a first draw PPP loan. To be eligible for a second draw, a borrower had to employ no more than 300 employees, demonstrate a 25% reduction in gross receipts during a calendar quarter in 2020, and have expended the full amount of its initial PPP loan. Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations. The expansion applied retroactively to first draw PPP loans not forgiven by the SBA.

11. On or around March 25, 2021, the PPP Extension Act of 2021 ("Extension Act") extended the application deadline from March 31, 2021, to May 31, 2021. In addition to extending the PPP application filing deadline by 60 days, the Extension Act provided an extra 30 days for the SBA to finish processing applications received by the May 31, 2021, deadline.

12. An Economic Injury Disaster Loan ("EIDL") was an SBA-administered loan designed to provide assistance to small businesses that suffer substantial economic injury as a result of a declared disaster. An EIDL helps businesses meet necessary financial obligations that could have been met had the disaster not occurred. It provides relief from economic injury that the disaster caused and permits businesses to maintain a reasonable working capital position during the period that the disaster affected. Additionally, the SBA offers an EIDL advance designed to provide emergency economic relief to businesses experiencing a temporary loss of revenue. This

advance does not have to be repaid and small businesses can receive an advance even if they are not approved for an EIDL.

13. In March 2020, due to the COVID-19 pandemic, the SBA issued an Economic Injury Disaster Loan declaration. The declaration made EIDLs available nationwide to small businesses to help alleviate economic injury that COVID-19 caused. EIDLs were usually limited to a maximum amount of $2 million. However, during the COVID-19 pandemic, EIDLs were limited, for a period of time, to $150,000.00. The amount of the loan and the amount of the advance were determined by the SBA based on information provided in the loan application.

14. Both the PPP and EIDL program paid benefits in connection with a presidentially declared major disaster or emergency as defined by 42 U.S.C. § 5122.

15. During the COVID-19 pandemic, EIDL funds were issued directly from the United States Treasury and applicants applied through the SBA via an online portal. The EIDL application process, which also used certain outside contractors for system support, collected information concerning the business and the business owner, including information as to the gross revenues for the 12 months prior to the disaster; the cost of goods sold; and information as to any criminal history of the business owner. Applicants were required to electronically certify that the information provided was accurate and were warned that any false statement or misrepresentation to the SBA on the application or any misapplication of loan proceeds could result in sanctions, including criminal penalties.

16. The SBA used electronic signature services provided by DocuSign for all EIDL applications. Such applications were transmitted over the interstate wires to a server maintained by the SBA in West Des Moines, Iowa. DocuSign facilitated the execution of those EIDL documents through DocuSign servers located in Illinois, Washington, and Texas.

**COUNT ONE**
**(Wire Fraud)**

17.   Paragraphs 1 through 16 are incorporated and realleged by reference.

18.   From in or about March 2020 through at least October 2021, within the District of Columbia and elsewhere, CORADO devised and intended to devise a scheme and artifice for obtaining money and property by materially false and fraudulent pretenses representations and promises.  It was the purpose of the scheme and artifice that CORADO would obtain money and other property from government-supported pandemic relief programs on behalf of Casa Ruby and misappropriate those funds for her own personal benefit.

19.   It was a part of the scheme and artifice that CORADO obtained EIDL funds in the amount of $500,000 from the SBA for Casa Ruby.  The SBA disbursed those funds to Casa Ruby from the U.S. Treasury in two transfers: (1) $150,000 on or about July 20, 2020; and (2) $350,000 on or about August 10, 2021.

20.   It was further a part of the scheme and artifice that in 2020 and 2021 CORADO executed loan agreements with the SBA in which CORADO made specific promises about how Casa Ruby would use the money received from the SBA, including the following:

   a.   CORADO promised, certified, and attested to the SBA that the EIDL funds would only be used as "working capital to alleviate economic injury" from the COVID-19 health crises.

   b.   CORADO promised, certified, and attested to the SBA that CORADO would not use any portion of the EIDL funds to relocate outside of the United States without the SBA's consent.

   c.   CORADO promised, certified, and attested to the SBA that CORADO would not distribute or transfer any of Casa Ruby's assets "to any owner or partner or any of its

6

employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company" without the SBA's consent.

        d.        The SBA relied on CORADO's promises about how Casa Ruby would use the EIDL funds and funded CORADO's loan in the amount of $500,000 by transferring $150,000 on or about July 20, 2020, and $350,000 on or about August 10, 2021, to Casa Ruby's M&T account x4601.

21.        It was further a part of the scheme that CORADO applied to the SBA for EIDL funds on behalf of TIGlobal, but the SBA denied the loan on February 25, 2021.

22.        It was further a part of the scheme that CORADO misappropriated EIDL funds for her own personal benefit through the following transactions:

        a.        On August 10, 2021, the same day that Casa Ruby received $350,000 in EIDL funds from the U.S. Treasury, CORADO went to an M&T Bank branch in the District of Columbia and deposited two checks—numbers 10626 and 10418—each drawn against Casa Ruby's account x4601 and payable to "TIGloballogistics" in the amount of $50,000 into another bank account (x0394) that CORADO controlled at M&T Bank in the name of TIGlobal. CORADO signed the front of both checks as the payor and endorsed the back of the checks as the payee.

        b.        On August 13, 2021, CORADO transferred $50,000 from TIGlobal account x0394 to an account in her birth name at Banco Cuscatlan El Salvador.

        c.        On August 18, 2021, CORADO transferred $30,000 from TIGlobal account x0394 into an account in her birth name at Banco Promerica in El Salvador.

23.        It was a part of the scheme and artifice that on February 17, 2021, CORADO applied to M&T Bank from a location in the District of Columbia for a PPP loan on behalf of Casa

Ruby in the amount of $456,215.  CORADO signed and submitted the PPP loan application in Washington, D.C., and the application was transmitted over interstate wires to M&T Bank via DocuSign.  In that application, CORADO promised, certified, and attested to M&T Bank that the funds would only be used for "payroll costs," "rent/mortgage interest," and "utilities."

    24. It was a further part of the scheme and artifice that on April 1, 2021, CORADO signed a loan agreement on behalf of Casa Ruby with M&T Bank for PPP Loan No. x8607.  In the agreement, CORADO further promised, certified, and attested that "[t]he loan proceeds shall be used only for a business purpose and pursuant to, and in accordance with, the PPP rules."  M&T Bank relied on CORADO's promises about how Casa Ruby would use the proceeds from Loan No. x8607 and funded CORADO's loan in the amount of $456,215 by transferring that amount to Casa Ruby's M&T account x4601.

    25. It was a further part of the scheme and artifice that CORADO transferred the proceeds of PPP Loan No. x8607 to bank accounts that CORADO controlled for CORADO's personal benefit rather than using the funds as she had promised to M&T Bank, including the following:

    a. On April 6, 2021—three days after receiving the proceeds of PPP Loan No. x8607—CORADO transferred $100,000 of those PPP loan funds from Casa Ruby's M&T account x4601 to a separate account that CORADO controlled at M&T Bank (x9064) in the name of TIGlobal.

    b. On April 15, 2021, CORADO transferred the $100,000 in PPP loan funds from the TIGlobal account at M&T Bank (x9064) to a personal offshore bank account that CORADO controlled in El Slavador, specifically account x5623 at Banco Cuscatlan de El Salvador S.A. in CORADO's birth name, Vladimir Orlando Artiga CORADO.

26. It was further a part of the scheme and artifice that on September 16, 2021, CORADO from a location in the District of Columbia submitted an application for loan forgiveness to M&T Bank for the full amount of Loan No. x8607. CORADO signed and submitted the PPP loan forgiveness application in Washington, D.C., and the application was transmitted over interstate wires to M&T Bank via DocuSign. In the application for forgiveness, CORADO certified as follows on behalf of Casa Ruby:

> The dollar amount for which forgiveness is requested …was used to pay business costs that are eligible for forgiveness (payroll costs to retain employees; business mortgage interest payments; business rent or lease payments; business utility payments; covered operations expenditures; covered property damage costs; covered supplier costs; or covered worker protection expenditures)[.]
>
> …
>
> I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges.

At the time that CORADO signed this certification to M&T Bank, CORADO knew that it was false. CORADO had already transferred $100,000 of PPP loan funds to other accounts for her own personal benefit.

27. It was further a part of the scheme and artifice that M&T Bank, in reliance on CORADO's fraudulent representations in the forgiveness application, applied to the SBA for funding to forgive PPP Loan No. x8607. Thereafter, the SBA transferred funds to M&T Bank sufficient for M&T Bank to grant forgiveness of Casa Ruby's PPP Loan No. x8607 in the amount of $456,215 in principal and $2,574.80 in interest.

28. It was further a part of the scheme and artifice that CORADO never made a payment to the SBA for the EIDL in the amount of $500,000 that CORADO was supposed to pay back to the SBA in monthly payments of $2,211.

29. On or about the following dates, CORADO, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, including but not limited to:

| DATE | TRANSMISSION IN INTERSTATE AND FOREIGN COMMERCE |
|---|---|
| September 16, 2021 | Application to M&T Bank for forgiveness of PPP Loan No.. x8607 signed by CORADO in Washington, D.C., and transmitted over to interstate wires to DocuSign and M&T Bank |

**(Wire Fraud, in violation of 18 U.S.C. § 1343)**

**<u>FORFEITURE ALLEGATION</u>**

30. Paragraphs 1 through 29 of this Information are re-alleged for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

31. Upon conviction of Wire Fraud in violation of Title 18, United States Code, Sections 1343 set forth in Count One of this Information the defendant, RUBY CORADO, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s). The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property, real or personal, involved in these offenses, or any property traceable to such property.

32. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

**(Forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); and 21 U.S.C. § 853(p))**

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:    /s/
JOHN W. BORCHERT (Bar No. 472824)
MADHU CHUGH (Bar No. 992122)
Assistant United States Attorneys
Fraud, Public Corruption & Civil Rights Section
601 D Street, NW
Washington, D.C.  20530
JWB: (202) 252-7679; john.borchert@usdoj.gov
MC: (202) 815-8609; madhu.chugh@usdoj.gov

May 31, 2024