IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | No. 24-CR-266 (TNM) |
| v. | |
| **RUBY CORADO** (a/k/a "Ruby Jade Corado" and "Vladamir Orlando Artiga Corado"), | Sentencing: October 15, 2025 |
| **Defendant.** | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its sentencing recommendation in this case. The government requests that the Court sentence defendant Ruby Corado to a period of incarceration of 33 months. Such a sentence is both consistent with the Sentencing Guidelines and warranted in light of the sentencing factors outlined in 18 U.S.C. § 3553(a).

### BACKGROUND

In approximately 2012, the defendant founded Casa Ruby, Inc. ("Casa Ruby"), a District of Columbia nonprofit that provided transitional housing and related support to youth who identified as lesbian, gay, bisexual, transgender, queer, and other sexual identities and orientations ("LGBTQ+"). (PSR[1] ¶ 26.) Casa Ruby received millions of dollars in donations, awards, and

---

[1] "PSR. ¶ _" refers to the final presentence investigation report in this matter at the stated paragraph. "ECF __" refers to the docket entries for this case at the indicated number.

grants from both private donors and government agencies, including the District of Columbia Department of Human Services ("DC-DHS"). (PSR ¶ 29.) Casa Ruby ceased operations in July 2022 and its affairs have been managed by a court-appointed receiver. (ECF 1-1 ¶ 19.)

The defendant and Casa Ruby received no less than $1.2 million in taxpayer-backed funds during the COVID-19 global health crisis. (ECF 1-1 ¶¶ 25, 27, 36). But rather than use those funds to support Casa Ruby's mission as the defendant promised, the defendant further contributed to its demise by unlawfully transferring no less than $180,000 of these federal emergency relief funds into her own private offshore bank accounts. (PSR ¶¶ 37, 41.) Then when media reports suggested the defendant would be prosecuted for squandering Casa Ruby's government funding, she sold her home and fled the country. (ECF 1-1 ¶ 20; ECF 8 at 6-7.) Meanwhile, the people who she had promised to pay with taxpayer-backed funds—her employees, landlord, and vendors—were left behind flat broke. (*Id.*)

    **I.**    **Fraud on the PPP Loan Program**

In 2020 and 2021, the defendant obtained two separate loans totaling nearly $800,000, from the federal government's Paycheck Protection Program ("PPP"). (ECF 1-1 ¶¶ 22-27.) The defendant fraudulently obtained these loans—and had the second loan forgiven—by representing that she would use the funds exclusively for Casa Ruby's business expenses when, in fact, she transferred at least $100,000 of the loan proceeds to her own personal foreign bank account. (PSR ¶ 44.)

Corado received a PPP loan in the amount of $329,200 on behalf of Casa Ruby on April 23, 2020. (PSR ¶¶ 32-34.) To receive the first PPP loan, the defendant certified, *inter alia*, that the United States was "the principal place of residence for all employees" of Casa Ruby, and that

2

the purpose of the loan was to pay Casa Ruby expenses, such as payroll, lease/mortgage interest, utilities, and healthcare. (PSR ¶ 32.)

Nearly one year later, on April 2, 2021, the defendant applied for and received another PPP loan on behalf of Casa Ruby in the amount of $456,215. (PSR ¶ 38.) Again, to receive the second PPP loan, the defendant fraudulently certified, *inter alia*, that the United States was "the principal place of residence for all employees" of Casa Ruby, and that the purpose of the loan was to pay business-related expenses, such as payroll costs, rent/mortgage interest, and utilities. (PSR ¶¶ 38-40.) Despite these promises, four days later—on April 6, 2021—the defendant transferred at least $100,000 of the second PPP loan disbursement to an account that only the defendant controlled in the name of TIGlobal Logistics[2] ("TIGlobal") in violation of PPP loan rules and the certifications she had submitted. (PSR ¶ 41.) On April 15, 2021, the defendant then transferred the same $100,000 in PPP loan funds to a personal offshore bank account in El Salvador. (*Id.*)

On September 16, 2021, the defendant then applied for forgiveness of the second PPP loan by fraudulently representing that she had used all of those loan proceeds—all $456,215—for Casa Ruby's expenses consistent with the terms of the loan. (PSR ¶¶ 42-44.) In fact, she had transferred at least $100,000 of those funds to her offshore bank account through the TIGlobal intermediary bank account. (*Id.*) Nonetheless, Casa Ruby received loan forgiveness for the full $465,215. (PSR ¶ 45.)

---

[2] On February 13, 2019, Corado registered TIGlobal with the Department of Licensing and Consumer Protection. (ECF 1-1 ¶ 21.) Corado was the only member of TIGlobal and, consequently, was required to report the gains and losses from TIGlobal to the IRS on Schedule C of her Form 1040 tax return. (*Id.*) On her tax return for 2019, Corado described TIGlobal's principal business or profession as "Service/Consulting." (*Id.*) On January 23, 2021, Corado registered "Casa Ruby Pharmacy" as a trade name for TIGlobal; that trade name expired on September 1, 2023. (*Id.*)

## II.     Fraud on the EIDL Program

In 2020 and 2021, Corado obtained two disbursements from the Economic Injury Disaster Loan ("EIDL") program.  In total, the defendant received $500,000 on behalf of Casa Ruby, after certifying in 2020 and 2021 that the disbursed funds would be used "solely as working capital to alleviate economic injury" from the COVID-19 pandemic, that the funds would not be used for "voluntary relocation," and the funds would not be disbursed to another company directly controlled by the borrower without the SBA's written consent.  (PSR ¶ 35.)  The U.S. Treasury made two deposits of EIDL funds into Casa Ruby's bank accounts: (1) a deposit of $150,000 on July 19, 2020; and (2) a deposit of $350,000 on August 10, 2021. (PSR ¶ 36.)

Despite the requirement that EIDL funds could not be disbursed to other companies owned by the borrower, on August 10, 2021 – the same day the defendant received the second EIDL loan disbursement – the defendant wrote two $50,000 checks from a Casa Ruby bank account to another account in the name of TIGlobal that only the defendant controlled.  Figure 1 and Figure 2 are images of the front and back of those two checks.  (ECF 1-1 ¶ 37.)



*Figure 1*



Figure 2

The defendant signed these two checks on behalf of Casa Ruby as the payor and endorsed the back of each check as payee when she deposited each into TIGlobal's account. (ECF 1-1 ¶ 38.) In so doing, the defendant violated the requirements of the EIDL program; in particular, the requirement that the funds only be used to alleviate economic harm stemming from the pandemic and for the "working capital" of Casa Ruby. (PSR ¶ 35.)

But the defendant's fraudulent activity did not stop there. She then transferred $80,000 of the $100,000 to her own personal foreign bank account in El Salvador in contravention of the EIDL program's requirements. (PSR ¶ 37.)

### III. Other Illicit Offshore Banking

As described above, Corado transferred $180,000 in EIDL and PPP loan funds intended for Casa Ruby to her personal bank accounts in El Salvador. However, law enforcement is aware that the defendant transferred another $119,999 – for a total of $299,999 – during 2021 to her own personal bank accounts in El Salvador. (ECF 1-1 ¶ 42.) The defendant failed to comply with federal law requiring any individual holding a foreign bank account with a balance greater than

$10,000 to file a Report of Foreign Bank and Financial Accounts ("FBAR") with her tax returns. (ECF 1-1 ¶ 43.) Indeed, there is no record of the defendant filing an FBAR for any foreign bank account for any tax year including 2021. (*Id.*)

### IV.    Flight from the United States

Casa Ruby effectively ceased operations as of July 2022—shuttering its transitional housing, failing to pay its employees, and facing eviction from multiple properties for failure to pay rent. (PSR ¶ 81; ECF 1-1 ¶ 20; ECF 8 at 6.) During July 2022, multiple media outlets reported complaints from landlords, vendors, and workers that Casa Ruby had not paid its debts.[3] The media also reported that the defendant sold her home in Prince George's County in January 2022; that multiple Casa Ruby employees stated they had not heard from the defendant since May 2022; and that social media indicated that the defendant was residing in El Salvador.[4]

Also during July 2022, the D.C. Office of the Attorney General filed a civil complaint, alleging that the defendant's financial mismanagement of Casa Ruby had violated the District's Nonprofit Corporation Act, D.C. Code §§ 29-401.01. *See* Complaint, *District of Columbia v. Casa Ruby, Inc.*, et al., No. 2022 CA 003343 B (filed July 29, 2022) ("OAG Case"). The D.C. Superior Court placed the nonprofit organization under receivership. OAG Case, 8/12/22 Order.

During the course of these events in 2022, the defendant left the United States for El Salvador. On February 25, 2024, the defendant returned to the United States from El Salvador.

---

[3] *See, e.g.*, Case Parks, *Casa Ruby Shuts Down the Rest of Its Operations, and Workers Go Unpaid*, The Washington Post (July 17, 2022), available at https://www.washingtonpost.com/dc-md-va/2022/07/17/casa-ruby-programs-close/ (last visited March 5, 2024); Dawn Ennis, *LGBTQ+ Shelter Mystery: Where's Ruby Corado? Where's the Money?*, Forbes (July 17, 2022), available at https://www.forbes.com/sites/dawnstaceyennis/2022/07/17/lgbtq-shelter-mystery-wheres-ruby-corado-wheres-the-money/?sh=28a27cbb1f60 (last visited March 5, 2024).

[4] *See* Parks *supra* note 2.

Law enforcement promptly sought an arrest warrant for the defendant. (PSR ¶ 81.) On March 5, 2024, the defendant was arrested on that warrant at a hotel located in Laurel, Maryland. (*Id.*)

## SENTENCING GUIDELINES

As the Court is well aware, although the U.S. Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court must first calculate the Guideline range applicable to the defendant. *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49-50 (2007).

### I. Stipulated Guideline Range

The defendant has pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1343. The government and the defendant have agreed upon the following guideline range:

| U.S.S.G. | Description | Levels |
|---|---|---|
| § 2B1.1(a)(1) | Base offense level | 7 |
| § 2B1.1(b)(1)(C) | Loss amount more than $150,000 but less than $1.5 million | +10 – +14 |
| § 2B1.1(b)(9) | Misrepresentation that defendant was acting on behalf of a charitable organization | 0 – +2 |
| | TOTAL | 17 – 23 |

The parties have agreed that the Court should determine at sentencing the specific loss amount and whether the two-point upward adjustment for misrepresentation concerning a charitable organization should apply. (PSR ¶ 129.) The government has agreed the defendant should receive a three-level downward decrease for acceptance of responsibility. (PSR ¶¶ 60-61.)

In accordance with the above, the agreed-upon offense level is not less than 14 and not greater than 20. (PSR ¶ 131.)

## II. Loss Amount

In April 2021, Corado fraudulently obtained a PPP loan in the amount of $456,215 by promising falsely in the application that those funds would be used only for Casa Ruby's "payroll costs," "rent/mortgage interest," and "utilities." (PSR ¶ 38.) Corado further promised that all of those funds would be used "only for a business purpose and pursuant to, and in accordance with, the PPP rules." (PSR ¶ 39.) Those promises were lies and Corado would have never received those funds but for those lies. (PSR ¶ 40.) Five months later, in September 2021, Corado received full forgiveness of that loan by falsely certifying to the bank that she had used those funds in the way she had promised that she would. (PSR ¶¶ 43-45.) The loss from that loan is $456,215.

During July 2020 and August 2021, Corado submitted false and fraudulent documents to the SBA to obtain $500,000 from the EIDL program. (PSR ¶ 35.) Corado falsely certified—once in 2020 and again in 2021—that she would only use the money for specific purposes and not for her personal benefit. (PSR ¶¶ 35-37.) Corado would not have received those funds but for her false certifications. (*Id.*) But on August 10, 2021, the same day that Corado received $350,000 of those funds, Corado immediately began moving those funds into offshore accounts. (*Id.*) To date, Corado has not repaid any of the funds she received from the EIDL program. Accordingly, the appropriate loss for guideline purposes is the full amount of that loan, *i.e.*, $500,000.

The full amount of both loans ($456,215 plus $500,000) should be included in the guideline loss amount, *i.e.*, not less than $956,215. Indeed, courts in this district have routinely looked to the full amount of the loan or assistance that was fraudulently obtained when calculating the loss for purposes of the Sentencing Guidelines. *See, e.g.*, *United States v. James Kyle Bell*, No. 21-cr-

284-JDB, ECF 25 at 1(D.D.C. Dec. 9, 2021) (calculating loss by reference to full amount of fraudulently obtained EIDL and PPP loans); *United States v. Kenneth Gaughan*, No. 21-cr-390-TSC, ECF 93 at 9 (D.D.C. May 12, 2024) (same); *United States v. Geary Simon*, No. 24-cr-284-DAF, ECF 32 at 1 (D.D.C. July 16, 2025) (calculating loss by reference to full amount of fraudulently obtained rental housing subsidy).[5]

The probation office suggests that the Court calculate the loss by looking only at "the value of the benefits obtained by unintended recipients or diverted to [*sic*] intended uses." (PSR ¶ 52 (citing U.S.S.G. § 2B1.1 comment 3(E)(iii).) The probation office submits that the only benefits "unlawfully transferred" to Corado were $200,000 in loan proceeds transferred to Corado's personal accounts in El Salvador. (*Id.*) This approach is problematic in several respects. First, Corado received the full amount of the PPP loans and EIDL benefits only by making false representations to M&T Bank and the SBA. (PSR ¶¶ 36-40.) But for those false representations, Corado would have received none of those funds. (*Id.*)

Second, the Special Rule in the guidelines for government benefit fraud cases is applicable only in cases where there are "unintended recipients" or "unintended use" of benefits such as, for example, when "the defendant was the intended recipient of food stamps having a value of $100 but fraudulent received food stamps having a value of $150." U.S.S.G. § 2B1.1 comment 3(E)(iii). In the case before the Court, the taxpayers have incurred a total loss because Corado should not have received <u>any</u> of the PPP loan or EIDL benefits. (ECF 27 ¶¶ 6-7, 10-11.) There is no evidence

---

[5] In connection with the PPP loan program, Corado also received a PPL loan in the amount of $329,200 from M&T Bank during April 2020. (PSR ¶ 34.) That loan amount would properly be considered as relevant conduct because securing that loan was a necessary "act[ ] committed … by the defendant … in preparation for" the offense of conviction. U.S.S. G. § 1.B1.3(A)(1). However, including that initial PPP loan in the loss amount will not impact the guideline calculation.

that these funds were ever used to cover Casa Ruby's payroll costs or any other legitimate business expenses. (ECF 1-1 ¶ 32.) And Corado has admitted to lying to obtain loan forgiveness in the full amount of the PPP loan from M&T Bank. (ECF 27 ¶ 13; PSR ¶¶ 43-45.) The Special Rule does not apply here.

The government submits that the loss amount is not less than $956,215. The defendant's offense score should be increased by 14 levels per U.S.S.G. § 2B1.1(b)(1)(H).

### III. Misrepresentation Concerning Charitable Organization

Guideline § 2B1.1(b)(9)(A) imposes a two-point offense level increase in cases where the offense conduct involves "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization[.]" The application notes to that guideline state that this two-level increase applies when a defendant obtains funds for a charity but "in fact, the defendant intended to divert some of the funds for the defendant's personal benefit." U.S.S.G. § 2B1.1, Application Note 8(b).

There should be little doubt that Casa Ruby was a charitable organization and that Corado acted on behalf of Casa Ruby in applying for PPP loan and EIDL funds. (PSR ¶¶ 26, 35, 39.) Likewise, there is not a serious dispute that Corado diverted taxpayer supported funds to personal bank accounts that she controlled in El Salvador for her personal benefit. (PSR ¶¶ 37, 41.) Thus, the probation office has correctly concluded—as should this Court—that the two-point offense level adjustment for misrepresentation on behalf of a charitable organization should apply. (PSR ¶ 54.)

### IV. Recommended Sentencing Guideline Range

With a loss amount of $956,215 and the inclusion of the two-point adjustment for misrepresentation of a charitable organization, the defendant's offense score after a three-point

10

reduction for acceptance of responsibility is 20. Corado's criminal history score is 1 point which places her in Category I. (PSR ¶ 66.) According to the sentencing table, an offense score of 20 with criminal history of Category I corresponds with a recommended guideline sentence of 33 to 41 months of incarceration.[6]

## STATUTORY FACTORS

As the Court is also well aware, after calculating the applicable Guidelines range, a sentencing court must then consider that range as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to that section's enumerated factors, of particular relevance here are the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense" and provide "just punishment," "the history and characteristics of the defendant," the need "to promote respect for the law," the need to "avoid unwarranted sentence disparities," and the need for the sentence "to afford adequate deterrence to criminal conduct." 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6), (a)(7).

---

[6] The probation office has recommended that the Court also apply a two-point upward adjustment because the offense involved fraud in connection with a presidentially declared emergency. (PSR ¶ 53.) The government defers to the Court on whether such an adjustment which was not included in the plea agreement should be appropriately applied here. It is worth noting, however, that EIDL benefits arguably were authorized by the SBA's declaration of a "disaster"—not a presidential declaration. *See* 85 Fed. Reg. 19052-53 (April 3, 2020). But, nevertheless, some courts have concluded that the two-point adjustment should apply as to EIDL benefits. *See, e.g., United States v. Griffin*, No. 22-4673, 2024 WL 1505512 at *3-4 (4th Cir., Apr. 8, 2024). And some courts have also concluded the adjustment does not apply to PPP loans. *Id.*

### Nature and Circumstances of the Offense, and its Seriousness

Corado's conduct was dishonest and disgusting. At a time when millions of Americans faced financial insecurity from a global pandemic—and Congress responded by releasing Treasury-backed funds as a remedy—the defendant saw an opportunity to cheat the taxpayers out of at least $950,000 in assistance. During the years 2020 and 2021, when the defendant was actively receiving those federal funds, she moved almost $300,000 offshore into bank accounts that were beyond the reach of law enforcement. All of the money that Corado received should have been used for the benefit of youth in the District of Columbia who were in need of housing and other services. Had the defendant kept her word and used the taxpayers' support as she had promised, Casa Ruby may have survived.

To be sure, the defendant has pleaded guilty to one count of wire fraud. But her offense conduct easily includes other crimes: money laundering, bank fraud, and tax offenses, just to name a few.

### History and Characteristics of the Defendant

Although Ms. Corado was once a leading charitable figure in our community, she betrayed the trust of the donors who supported her, the District of Columbia, and the federal government that funded her. The people who she cheated were part of the same community that she claimed to serve. This speaks volumes about her character. When her character for dishonesty is coupled with the fact that the defendant abandoned her career, sold her home, and fled the country after learning she might be prosecuted for her financial misconduct, the justice system should respond with a forceful message.

The defendant was the founder and namesake of Casa Ruby. A transgender immigrant from El Salvador who overcame great adversity, she understood better than anyone the need for

services for LGBTQ+ youth in the District. With the promise of serving this community, the defendant raised millions of dollars in private and government contributions. But rather than use the opportunity of the immense emergency relief funding offered during the pandemic as a second chance to keep Casa Ruby solvent, the defendant took advantage of the situation to formulate an exit strategy. She absconded to El Salvador with at least $180,000 of the taxpayers' loan proceeds.

Today, the defendant claims to own no property in the United States. She reported to the probation office that owns only a "small house" and vehicle in El Salvadore—even though she has also admitted to controlling at least three bank accounts there and transferred almost $300,000 to those accounts. (PSR ¶ 122.) Consequently, even now, Corado refuses to account for the funds that she moved offshore and has no intention of re-patriating any funds to make restitution for her crimes.

Promotion of Respect for the Law,<br>
<u>General Deterrence, and Avoiding Disparities</u>

This case involves fraud on a government program that was motivated by greed at a time when millions of Americans were suffering from the economic impact of a global pandemic. As the pandemic spread, so too did fraud related to the programs designed to provide critical economic assistance. Actors like Corado who seek to defraud these programs not only drain programs of limited funding; they make it more difficult for administrators of government and other relief programs to get aid to individuals that qualify for and need it. The government's recommended sentence of incarceration in this case is thus appropriate to send a message to other offenders that there are serious consequences for defrauding government pandemic relief programs.

The government's recommended sentence of 33 months of incarceration, which is at the low end of the guideline range, will not create an unwarranted sentencing disparity. Courts have not hesitated to sentence defendants who have cheated pandemic relief programs to substantial terms of imprisonment that are consistent with the guideline range in those cases. *See, e.g., United States v. David Hines*, No. 21-CR-20011 (S.D. Fla. May 12, 2021) (78 months of incarceration; guideline range of 63-78 months); *United States v. Ganell Tubbs*, No. 20-CR-193 (E.D. Ark. March 15, 2021) (41 months of incarceration; guideline range of 41-51 months); *United States v. Benjamin Rafael*, No. 21-CR-20161 (S.D. Fla. July 14, 2021) (18 months of incarceration; guideline range of 12-18 months). Accordingly, the government's recommendation of 33 months of incarceration for Corado falls in line with comparable cases.

## RESTITUTION AND FORFEITURE

The ultimate victim of the financial fraud in this case was the taxpayers. As part of the sentence in this case, the Court should order the defendant to make restitution to the taxpayers for the full amount of their loss, *i.e.*, $956,215.

Forfeiture is separate from restitution. The Court should enter a forfeiture money judgment against the defendant in the amount of the proceeds that the defendant personally obtained from her participation in the fraud scheme. In this case, the defendant misappropriated $956,215 in taxpayer assistance for her own benefit and the Court should enter a forfeiture money judgment in that amount. The forfeiture allegation in the Information provides notice to the defendant that the government intends to seek forfeiture of a money judgment at sentencing. (ECF 23 ¶¶ 30-32.)

The government will provide proposed orders of restitution and forfeiture to the Court in advance of sentencing.

## CONCLUSION

The government recommends that the defendant be sentenced to serve a period of incarceration of 33 months which is consistent with the sentencing guidelines. The government also asks that the Court enter orders of restitution and forfeiture as described above.

                              Respectfully submitted,

                              JEANINE FERRIS PIRRO
                              United States Attorney

By: _____
     JOHN W. BORCHERT (Bar No. 472824)
     Assistant United States Attorney
     Fraud, Public Corruption & Civil Rights Section
     601 D Street, NW
     Washington, D.C.  20530
     (202) 252-7679
     john.borchert@usdoj.gov

October 8, 2025

CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October 2025, I caused a copy of the foregoing to be served on counsel for the defendant via the Court's ECF notification system.

_____
JOHN W. BORCHERT
Assistant United States Attorney