## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 24-cr-266 (TNM) |
| | ) | |
| RUBY CORADO | ) | |

### RUBY CORADO'S MEMORANDUM IN AID OF SENTENCING

This sentencing memorandum is respectfully submitted on behalf of Ruby Jade Corado, who is scheduled to be sentenced on January 13, 2026, after having accepted responsibility to one count of wire fraud, in violation of 18 U.S.C. § 1343.

Ruby Corado escaped the horrors of the Salvadorian civil war and arrived in this country almost thirty years ago without a penny to her name. As a transgender refugee fending for herself in Washington, D.C. in 1990s, she experienced homelessness, discrimination, and sexual violence. Through sheer grit and determination, Ms. Corado got herself on her feet. Throughout her own struggles, Ms. Corado maintained a deep-seated desire to help others in need. In particular, she wanted to give back to the vibrant LGBTQ community that had welcomed her when she arrived in the city as an impoverished refugee. After volunteering at various organizations, she opened Casa Ruby, a non-profit that ministered to transgender youth. Starting as a small drop-in center entirely funded by Ms. Corado, Casa Ruby grew into a large non-profit which provided shelter, food, and counseling for thousands of LGBTQ youth. In 2019, Ms. Corado began to dream of bringing Casa Ruby's services to El Salvador, where she knew all too well that transgender individuals experience state-sponsored discrimination and violence.

Ultimately, though Ms. Corado's passion for helping others never wavered, she

lacked the management skills and education to operate an organization of Casa Ruby's size. Ms. Corado is the first to acknowledge she made serious mistakes, some of which led to Casa Ruby's demise. In 2020, Ms. Corado applied for two federally funded COVID relief loans. She has admitted that she diverted a portion of those loans to El Salvador, which was prohibited by the terms of the loans. In this memo, counsel will explain that Ms. Corado intended to use the funds from the loans to spearhead Casa Ruby's services in El Salvador. That said, however, Ms. Corado knows that what she did was wrong and illegal and she has accepted responsibility through her guilty plea.

The defense has reviewed the Pre-Sentence Report (PSR) and offers the following objections to the guidelines range: first, a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(A) does not apply because Ms. Corado was working on behalf of charity for many years and second, a two-level enhancement does not apply under U.S.S.G. § 2B1.1(b)(12).

Irrespective of the guidelines range the Court finds, the defense respectfully submits a sentence of time-served, in addition to the immigration consequences that will necessarily result from Ms. Corado's plea, is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in Section 3553(a).

## I.    Relevant Background

Ruby Corado was arrested on March 6, 2024, on a complaint charging her with, inter alia, wire fraud. *See* Dkt. No. 1. Ms. Corado was arrested in Washington, D.C., after having voluntarily returned to the District from El Salvador, where she had been staying with her husband. On March 12, 2024, the Honorable Magistrate Judge Merriweather released Ms. Corado into the High Intensity Supervision Program. Dkt.

No. 16. On June 11, 2024, Magistrate Judge Meriweather granted Ms. Corado's unopposed motion to go outside for exercise. Dkt. No. 25. At the plea agreement hearing on July 17, 2024, this Court modified the conditions of release to move Ms. Corado from home incarceration to a curfew due to her record of compliance. 7/17/25 Minute Order. Since her release, Ms. Corado has been perfectly compliant with her conditions of release.

On July 17, 2024, Ms. Corado pleaded guilty to an Information charging her with wire fraud in violation of 18 U.S.C. § 1343. In pleading guilty, she waived her right to be indicted by a grand jury and accepted full responsibility for her actions. Following her plea, Ms. Corado cooperated with the pre-sentence investigation.

Since the plea hearing, Ms. Corado has been dealing with a variety of health issues and the Court continued the sentencing hearing to permit Ms. Corado time to address these concerns.

Following a hearing held on October 14, 2025, in which Ms. Corado requested new counsel, the Court revoked her conditions of release and held her pending sentencing.

## II.    Legal Standard

When imposing a sentence, the Court must consider several factors, including (1) the United States Sentencing Guidelines; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct, along

with the kinds of sentences available; and (5) the need to avoid unwarranted

disparities.  *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

*See* 18 U.S.C. § 3582 (emphasis added).  With that limitation and considering all the

purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not*

*greater than necessary*, to comply with the purposes [of sentencing]."  18 U.S.C.

§ 3553(a) (emphasis added).

When sentencing a defendant, the Court "may not presume that the Guidelines

range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007). Rather, the Court

must treat the Guidelines "as one factor among several" that § 3553(a) requires the

Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court

correctly calculates the sentence that the Guidelines recommend, the Court must then

"make an individualized assessment," considering the remaining factors set forth in

§ 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view

"rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives,"

*Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually

does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S.

338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general

advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It

has been uniform and constant in the federal judicial tradition for the sentencing judge

to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))). The Court may reject a guideline provision where the facts do not constitute a "mine run" or "heartland case" as contemplated by the guidelines in question. *See Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

### III.   Application of the Sentencing Factors Warrants a Sentence of time served.

### A.   The United States Sentencing Guidelines range is 15-21 months.

#### i.   The "loss amount" results in a 10-level adjustment to the base offense level.

There is no dispute that in her capacity as Director of Casa Ruby, Ms. Corado applied for two federally funded loans during the height of the COVID-19 pandemic. The first loan, administered by the Small Business Administration's ("SBA") Economic Injury Disaster Loan ("EIDEL") program was funded in the amount of $500,000. Statement of Offense, Dkt. No. 27. The second loan, granted by M & T Bank as part of the SBA's Paycheck Protection Program ("PPP") was in the amount of $456,215. *Id.* The loan funds were deposited directly into Casa Ruby's bank account. Ms. Corado has accepted responsibility for transferring *a portion* of the loan disbursements into another account she operated and ultimately transferring those funds to an account in El Salvador. Her purpose in transferring funds to El Salvador was to fund Casa Ruby programs in El Salvador. Of course, she acknowledges that the terms of the loan agreement did not permit her to transfer the funds to El Salvador for any purpose. In

total, Ms. Corado transferred **$200,000**[1] of the loan disbursements out of the Casa Ruby account. The remainder of the funds remained in Casa Ruby's account. There is no evidence that the funds in the Casa Ruby account were used in any way contrary to the loan agreement. Indeed, Casa Ruby stayed open and active until July 2022—over a year after the loans were funded. The loss amount, therefore, is properly calculated at $200,000, *i.e.*, the amount of loan funds Ms. Corado transferred to El Salvador in violation of the terms of the loan agreement. The record and the Guidelines do not support including the remainder of the loan funds in the loss amount.

"Loss amount" is not defined in the Guidelines. However, § 2B1.1 commentary addresses the scenario presented here. With respect to "government benefits," the commentary instructs:

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by the *unintended recipients* or diverted to *unintended uses*, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value or $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 cmt. (F)(ii) (emphasis added).

In this case, Ms. Corado diverted $200,000 for unintended use. Therefore, a plain reading of the Guidelines and the commentary demonstrates that the "loss amount" is properly calculated at $200,000 and results in a 10-level adjustment to the base offense level.

### ii. A two-level enhancement under U.S.S.G. § 2B1.1(b)(9) does not apply.

A two-level enhancement applies if "the offense involved (A) a misrepresentation

---

[1] Statement of Offense, ¶¶ 7(a), (b), (c), 11(a), (b), (c).

that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." U.S.S.G. § 2B1.1. The commentary provides guidance as to when the enhancement applies:

> Subsection (b)(9)(A) applies in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable, educational, religious, or political organization, or a government agency (regardless of whether the defendant actually was associated with the organization or government agency) when, in fact, the defendant intended to divert all or part of that benefit (e.g., for the defendant's personal gain).

U.S.S.G. § 2B1.1 cmt. 8 (B).

In this case, when Ms. Corado applied for and received the loans at issue, she fully intended to use the funds for Casa Ruby's purposes. And, as set forth below, when she diverted a portion of the funds to a bank account in El Salvador, she intended to use that money to fund Casa Ruby's charitable works in El Salvador. To be clear, Ms. Corado does not dispute that the act of diverting the funds was illegal because it violated the terms of the loan. She knew that the loans were disbursed based in part on her representation that the funds would be used to support Casa Ruby in the United States. However, § 2B1.1(B)(9)'s enhancement does not apply because her intent was always to fund her charitable organization and not to enrich herself.

### iii. A two-level enhancement under USSG § 2B1.1(b)(12) does not apply.

As the parties contemplated in the plea agreement, an enhancement under §2B1.1(b)(12) is not applicable. This enhancement was created to deal with situations where emergency relief is provided as a result of a natural disaster or other national emergency, not a global economic emergency. The COVID pandemic and resulting CARES Act programs were in response to a global economic crisis, not the type of

declared emergency considered under this enhancement.

Additionally, this enhancement has not been included in the Presentence Report or applied in similar cases in this district and application here would create unwarranted disparities. *See, e.g., United States v. Fields*, No. 25-43 (TNM); *United States v. Villatoro*, No. 24-446 (CJN); *United States v. Chen*, No. 24-50 (CRC); *United States v. Strauss*, No. 24-374 (RC). There is no reason to include this enhancement for Ms. Corado when it has not been included in the past.

The government urges the Court to view this case through the lens of generic pandemic-fraud prosecutions. But § 3553(a) demands an individualized assessment. Whatever the seriousness of the offense, the Court must also consider the nature of the punishment that will actually be imposed on this defendant. For Ms. Corado, incarceration is not a neutral sanction. It carries with it a foreseeable risk of extraordinary harm because of her transgender status and the current retreat from federal protections designed to keep LGBTQ+ inmates safe. The Court may, and should, account for that reality in determining what sentence is sufficient, but not greater than necessary.

**B. Ms. Corado's history and characteristics demonstrate that a sentence of time-served is appropriate**.

**i. Ruby Corado's childhood was shaped both by loving parents and child sexual abuse; and later, the violent protracted Salvadorian civil war.**

Ruby Corado, born Vladimir Artiga, was born in San Salvador, El Salvador in 1970, to a middle-class family. Her mother was a factory worker and her father an electrician. Six years after Ruby was born, her sister joined. For the first ten years of her life, the family enjoyed a relatively stable life in a modest home in San Salvador.

Beneath the surface, however, little Ruby suffered in silence. When she was approximately four years old, a neighbor sexually abused her repeatedly. At the time, she did not totally appreciate what was happening to her, but she knew it was wrong. She did not tell any adult but later confided in a cousin with whom she was close.

When Ruby was nine years old, her childhood was rocked by two seismic events that would alter the trajectory of her and her family's life. First, her parents separated after years of her father's infidelity. Ruby's mother moved out. Ruby's father would eventually remarry and have four more children. At the same time that Ruby's parents separated, a bloody civil war broke out that plunged El Salvador into chaos and violence, spanning over twelve years and resulting in over 75,000 deaths and thousands of missing persons. The war—fought between the government of El Salvador and the Farabundo Marti National Liberation Front (FMLN)—had brutal consequences for civilians. Both sides, aided by paramilitary groups allied to them, inflicted unspeakable acts of violence on innocent civilians, including torture, rape, and arbitrary death squads.[2] Few families were spared the violence of the war. Ruby's family was no exception. After the separation, Ruby's mother was forced to move to a small village on the outskirts of San Salvador where workers for the nearby factory lived. The village, because of its proximity to the mountains where paramilitary groups conducted operations, became an epicenter of violence and killing. Ruby recalls walking to school along streets littered with dead bodies and body parts. She recalls she, her sister, and

---

[2] *See* El Salvador, Center for Justice and Accountability, available at https://cja.org/where-we-work/el-salvador/ (last visited July 24, 2025).

mother would sleep under the bed in her mother's small shack in an effort to escape the sounds of the bombs going off in the nearby mountains.

In 1986, Ruby's father felt that it was no longer safe for Ruby and her sister to attend the public school, so he scraped together his savings and sent the sisters to private school in San Salvador, where Ruby was able to graduate from high school.

### ii. When Ruby was 18, her family decided they needed to escape the civil war and sent Ruby on a harrowing journey to the United States.

While Ruby was in high school, her cousin, who had been involved in politics, was kidnapped by the government. Ruby, who visited her cousin often, was also threatened with kidnapping. At that time, rebel fighters were threatening boys and young men with the purpose of conscripting them to fight. After the kidnapping, the family decided it was too dangerous to stay in El Salvador. One by one, the family began to immigrate to the United States. Because she was the oldest of the five children, Ruby's father decided she would be the first to go. Ruby, 18 years old, had no idea what she was in for when her father told her that he had made arrangements for her to travel to a place called Silver Spring, Maryland, where her father secured her a place to stay with other Salvadorians. On the day of her departure, she showed up at the bus stop thinking she would be taking a bus the whole way. Instead, she embarked on a treacherous six-month journey with a group of others fleeing the violence of the war. The group, led by a coyote, walked through the nights, took various cars, and ultimately hid under the floorboards of a vegetable truck to make it to the United States. After making it across the border, Ruby made her way to the address her father had given her, a large house in Silver Spring, which housed dozens of Salvadorian refugees.

Ruby's first home in the United States was far from the safe haven that her father had hoped for. The couple who ran the house demanded the residents—all refugees desperate for basic necessities—work long hours and turn over 100 percent of their wages for "rent." Meanwhile, the residents lived in overcrowded, squalid conditions. Ruby experienced more economic deprivation during her first few months in the U.S. then she had ever experienced in El Salvador. She was also sexually harassed by older residents of the group house and one resident attempted to rape her. Despite the impoverished and challenging living conditions, she reveled in feeling free from the pervasive violence of war for the first time in a decade.

### iii. Through grit and determination, Ruby built a life in the United States.

After living in the refugee house for a few months, Ruby set off on her own to pursue her dreams. At first, she was homeless working odd jobs and resorting to sex work to get by. Her first steady job was as a janitor at an apartment building. After gaining relative stability, one of the first things she did was explore how to obtain legal status in the United States. In 1990, she was granted "ABC TPS"—the name given to the status granted to Salvadorians after the American Baptist Church and a coalition of churches sued the then-named Immigration and Naturalization Services for violating the Refugee Act of 1980 and discriminating against Guatemalans and Salvadorians. Following the litigation, Congress ratified temporary protected status (TPS), permitting eligible recipients to obtain legal status and work authorizations.[3] Salvadorians, including Ruby, were the first recipients of TPS.

---

[3] https://guides.loc.gov/latinx-civil-rights/abc-v-thornburgh, (last visited December 22, 2025).

### iv. Ruby's unique experience as a transgender refugee motivated her to help others.

One of Ruby's earliest memories is playing "circus" with the neighborhood kids. Ruby, then identifying as a boy, always wanted to be the ballerina. She recalls the little kids did not question it; she *was* the ballerina. When she was five years old, her father who was an avid soccer fan, took her to play soccer with a group of boys. She remembers crying because she did not want to play soccer with the boys. Later, as children got older and started to develop, she was bullied for being effeminate. Her family could see that their child was struggling but did not speak openly about gender or sex. And so Ruby suffered silently, feeling trapped in a body that did not feel right. She did not know what a transgender was until she arrived in the United States. She distinctly remembers the first time she met a transgender woman. Talking to this woman, Ruby thought to herself, "this is me." In 1992, Ruby began to transition and by 1996, she was fully identifying as a woman. In 2004, she officially changed her name.

After getting on her feet in the United States, Ruby soon began her efforts to protect and care for her fellow transgender community members. She wanted to give back to the community that had welcomed and supported her when she was in crisis. Herself HIV positive, Ruby first began volunteering and then working at Whitman-Walker Health, a health center for HIV-positive and AIDS patients. After many years of direct service, Ruby started Latinas en Accion, an LGBT support group, at Whitman-Walker to provide additional care and community for a group that has been disproportionately harmed by HIV and AIDS. Around the same time, Ruby founded the DC Trans Coalition to advocate for transgender rights in the District. Her activism included successfully lobbying to expand the DC Human Rights Act to make "gender

identity and expression" an additional protected category and engaging with the D.C. Department of Corrections to provide better treatment for transgender people in custody. Ruby, through her own experience as a transgender refugee in this city, knew that the services and protections available to LGBTQ Washingtonians were woefully inadequate. So she took it upon herself, through service and activism, to make changes. Although it was almost over before it started, no endeavor embodied this more than Casa Ruby.

### v. After surviving a vicious attack, Ruby founded and ran Casa Ruby to provide critical services to the District's LGBTQ community.

In 2008, Ruby's was once again the victim of sexual violence, which threatened her life and nearly derailed her advocacy for the transgender community. Her then partner came to her home, beat her viciously, and raped her. Not only was the attack itself horrific, but it sent Ruby into a dangerous spiral. She suffered from addiction and depression, became homeless, and felt suicidal. The attack, Ruby says, "destroyed [her]. [She] felt so empty." In 2011, Ruby attempted suicide.

Despite the devastation wrought by this attack, Ruby was able not only to recover herself but to continue to support D.C.'s transgender community in ever more impactful ways. Taking the money she received as disability back pay, Ruby poured it into founding and running Casa Ruby—a refuge for LGBTQ Washingtonians. She had long dreamed of opening a safe space for transgender people in the city and took this opportunity to do so despite the personal duress she was under. In addition to her money, Ruby also poured herself into Casa Ruby. She became a mother figure to many people that had been abandoned by their birth families; she was an example that you

could make it as a transgender woman in D.C.; she was a caregiver and a listener; and she was a fierce protector of her clients—her kids, as she calls them.

Ruby opened Casa Ruby in 2012. It started as a small drop-in center with a handful of volunteers. Initially funded entirely by Ruby, in less than a decade, it grew into a nonprofit with more than 100 employees and thousands of clients. Casa Ruby provided vital protection, services, and community for the LGBTQ community in the District, especially for immigrants and transgender and young people. Ruby's commitment to low barrier to access and holistic support meant Casa Ruby filled a gaping hole in the District's services.

Casa Ruby grew quickly, increasing the reach and range of services provided to cover the multitude of needs of the transgender and gay community. Within a year, Casa Ruby was hosting support classes and community meetings, providing community health education about HIV and AIDS, serving hot meals, teaching Spanish and English language classes, and supplying mental health treatment with a certified psychologist. In addition to these social services, the organization hosted a cosmetology-certification course to aid their clients in obtaining safe employment. Casa Ruby also quickly established their hallmark 24/7 drop-in center, providing a safe space and a caring community at all times, even when other shelters aren't regularly open. By the end of 2012, Casa Ruby had provided over 3,000 direct services to members of the community.

Recognizing the need for even more volume and a greater range of services, Casa Ruby kept growing. Led by Ruby, the organization built capacity through community support, partnerships with other organizations and the government, and the sheer determination of Ruby and her staff. The job trainings offered expanded to include

training for medical technicians, interior design, and general job skills development workshops. Casa Ruby's focus on transgender clients, who are significantly more likely to be HIV positive, led the organization to bring HIV prevention and care services directly on site through the Casa Ruby Pharmacy. The Casa Ruby footprint was also increasing, expanding to multiple buildings across Northwest and one in Southeast. At its height, Casa Ruby was serving hundreds of clients each week.

Ruby also continued to advocate for positive policy changes for and increased acceptance of the District's LGBTQ population. She helmed the D.C. Anti-Violence Collaborative, a coalition of organizations formed to protect LGBTQ people from disproportionate levels of violence and other forms of oppression. Casa Ruby also partnered with the D.C. Office of Human rights on initiatives such as hosting a community health fair and pushing for gender-neutral single-use bathrooms in the District.

Casa Ruby's largest endeavor was to provide low-barrier emergency housing for LGBTQ youth and adults. In 2016, over 40% of young people experiencing homelessness in D.C. identified as LGBTQ. This disproportionately high number is caused by kids being discarded by their families, bullied at school, and discriminated against while searching for jobs. It is compounded by the higher rates of survival sex work, substance abuse, and mental health challenges among LGBTQ young people.[4] When Casa Ruby opened their shelter in 2015, it was the only LGBTQ specific one in the city. Not only were Casa Ruby's beds a critical resource for these kids, but so too was the community

---

[4] *See* https://www.washingtonian.com/2017/06/29/bigotry-poverty-keeping-washingtons-lgbtq-youth-homeless/

that Ruby cultivated—providing a loving (chosen) family and mentors who had endured the same struggles. The holistic care that Casa Ruby offered was a bulwark against all of these interrelated struggles.

LGBTQ adults, particularly transgender women, are also disproportionately likely to be homeless. One recent study found that transgender adults across the country were almost six times as likely to be homeless as their cisgender counterparts, as they face similar discrimination and challenges as LGBTQ youth.[5] When they seek emergency housing, transgender women are often denied entrance or misgendered and placed in the men's quarters where they are at risk for abuse and the guards do little to protect them. This leads to numerous instances of transgender women being assaulted in homeless shelters and countless more foregoing shelters altogether and sleeping on the streets.[6] Ruby, from her time unhoused and understanding the need to engage in survival sex work, is all too familiar with this reality.

Casa Ruby's inclusive housing for LGBTQ adults therefore provided an essential and unique service for protecting unhoused transgender people and giving vulnerable people a safe sense of community. After opening a third shelter in 2018, Casa Ruby had over 75 beds for LGBTQ youth and adults.

Growing Casa Ruby into such a high profile, impactful organization did not come without challenges, Casa Ruby and its clients were repeatedly attacked. In 2016, an

---

[5] *See* https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Homelessness-May-2020.pdf

[6] *See, for e.g.,* https://streetsensemedia.org/article/what-are-you-finding-a-place-for-transgender-homeless/ and https://wtop.com/dc/2015/12/d-c-shelter-offers-emergency-option-for-lgbt-homeless/

assailant damaged the building and equipment. In 2017, someone threw a brick through the door and someone else, in a separate incident, pepper sprayed a transgender woman on Casa Ruby's property. In 2019, a transgender woman was threatened at gunpoint outside Casa Ruby and a former client, another transgender woman, was killed.[7] These acts of violence tormented Ruby, who has never recovered from the violence that she experienced in her own life.

At the same time, running a large organization—which by 2018 was receiving millions in grants—overwhelmed Ms. Corado. While she had a deep-seated drive to help the most vulnerable in the community, she herself had only a high school diploma. She grew up in war-torn El Salvador and, at the behest of the family she trusted, made the harrowing journey from El Salvador to the United States. When she arrived in the U.S., alone and without a penny to her name, she drew upon her innate survival instinct. She survived the abusive tenement home. She survived living on the streets as a transitioning transgender. She survived horrific sexual abuse. It is not an understatement to say that by the time she had risen to prominence as Casa Ruby's founder, she had narrowly escaped death several times. And so, while Ruby never lost the passion, rooted in her own experiences, to help the most vulnerable in the D.C. Community, she was in over her head.

---

[7] *See, for e.g.,* https://www.washingtonpost.com/local/the-murder-of-black-transgender-women-is-becoming-a-crisis/2019/06/17/28f8dba6-912b-11e9-b570-6416efdc0803_story.html and https://www.washingtonpost.com/graphics/2019/local/dc-hate-prosecutions-drop/ and https://abcnews.go.com/US/trans-women-color-facing-epidemic-violence-day-fight/story?id=66015811

These same characteristics also make clear why incarceration would exact a uniquely destructive toll on Ms. Corado. She is not only a transgender woman, but one whose life has been marked by sexual violence, homelessness, war-time trauma, and repeated victimization. Federal policy developments now reflect a retreat from even baseline protections for transgender inmates, exposing them to heightened risk of assault, degrading treatment, and denial of medically necessary care. For someone with Ms. Corado's history, confinement under such conditions would not merely punish—it would retraumatize. Section 3553(a)(1) requires the Court to consider these characteristics in human terms, not as abstractions, when assessing what sentence is fair and just.

## C. The nature and circumstances of the offense support a sentence of time-served.

Ms. Corado's offense conduct is accurately set forth in the Statement of Offense. She acknowledges that she illegally diverted portions of two federally funded loans to a bank account in El Salvador, in violation of the terms of the loans.

While Ms. Corado acknowledges that she used some portion of the loan funds outside the United States, in violation of the terms of the loans, the money was not diverted to enrich Ms. Corado, but to allow her to establish Casa Ruby El Salvador, in the hopes that by assisting LGBTQ individuals in El Salvador, she could decrease the need to emigrate to the U.S. Ms. Corado was connected to the D.C. Mayor's Office and worked with them on both LGBTQ issues, as well as immigration issues. From these connections, which included visits to El Salvador with the Mayor's Office, Ms. Corado began to think about how she could expand her reach to her home country.

Ms. Corado's desire to help others was genuine, but she acknowledges that she went about it the wrong way. Ms. Corado went to El Salvador in 2022 to begin to set up Casa Ruby El Salvador. She worked with other individuals in El Salvador who focus on LGBTQ, and specifically transgender, outreach to open the Luau Social Club, which was designed to be a safe space for the LGBTQ community to work and spend time. Luau Social Club held events for the LGBTQ community, including Pride events. Prior counsel, from the Federal Public Defender's Office, met with individuals in El Salvador who experienced the community created by Luau Social Club. Efrain Zapada Burka described events held there and that it was Ruby's mission to find a safe space for the community. Efrain described Ruby as someone with so many ideas for who to held her community, which was often a challenge because she wanted to do too much. Damaris helped Ms. Corado set up Luau. She explained that Ms. Corado trained her, paid for her housing, and helped her provide a safe space for her child. As a single mother, she was grateful for the assistance provided by Ms. Corado.

Unfortunately, the business did not succeed. But Ms. Corado's outreach in El Salvador continued. She focused on connecting with individuals who needed her help and did what she could on a personal level to support LGBTQ individuals in El Salvador who were struggling. Daniel described how Ms. Corado gave him $30 a month to help her survive and bought her a new cooler to use to sell drinks and snacks on the street corner. To Daniel, Ms. Corado "was a selfless person who fought for the rights of this marginalized community." Another person helped by Ms. Corado was Patty, a disabled/handicapped woman living in San Salvador. Ms. Corado helped her pay for housing and food.

Ms. Corado accepts full responsibility for her actions in this case. She acknowledges the false statements made in the loan applications and that she used some of the money outside the United States, in El Salvador. However, the money was still utilized for the same purpose and intention as the funds used in the United States, to assist the LGBTQ community. It just happens that those being assisted were in El Salvador and not in the United States. Ms. Corado did not use the money to buy lavish goods or fund a lavish lifestyle. While it does not change that her actions were unlawful, the intent and use of the funds does provide mitigating circumstances to justify a time served sentence.

The government urges the Court to view this case through the lens of generic pandemic-fraud prosecutions. But § 3553(a) demands an individualized assessment. Whatever the seriousness of the offense, the Court must also consider the nature of the punishment that will actually be imposed on this defendant. For Ms. Corado, incarceration is not a neutral sanction. It carries with it a foreseeable risk of extraordinary harm because of her transgender status and the current retreat from federal protections designed to keep LGBTQ+ inmates safe. The Court may, and should, account for that reality in determining what sentence is sufficient, but not greater than necessary.

## D. The Court should consider that Ms. Corado's sentence will be uniquely punishing because of her status as a non-citizen and as a transgender.

Any suggestion that federal custody can adequately protect Ms. Corado is contradicted by recent DOJ policy itself. In December 2025, the Department has directed auditors to suspend enforcement of Prison Rape Elimination Act (PREA)

protections designed to protect LGBTQ+ individuals from sexual assault, harassment, invasive searches, and discriminatory housing. Auditors were instructed to stop enforcing standards requiring screening for risk of victimization based on LGBTQ+ status and to disregard rules meant to ensure respectful treatment of transgender inmates. Advocates warned that the changes would predictably lead to increased chaos and violence behind bars, noting that transgender people already face endemic abuse even when protections are nominally in place.[8] Advocates and attorneys with direct experience in BOP litigation warn that these changes embolden abuse and place transgender women in grave danger. In this environment, assurances of adequacy ring hollow. Section 3553(a) does not require the Court to assume away systemic risks that will predictably fall on this defendant.

At the same time, DOJ policy has moved to align federal detention practices with directives rejecting gender identity in favor of "biological sex," resulting in transgender women being transferred into men's facilities and in efforts to curtail gender-affirming medical care. Attorneys representing transgender women in BOP custody have described these shifts as placing their clients in "incredibly dangerous" situations, effectively emboldening predators and exposing inmates to foreseeable harm. As one longtime advocate explained, the signals sent by these policies can determine "whether a person lives or dies." [9]

---

[8] https://www.theguardian.com/us-news/2025/dec/05/doj-prison-lgbtq-sexual-abuse-protections

[9] https://www.bloomberg.com/news/articles/2025-12-09/trump-administration-ditches-protections-for-transgender-inmates?

In relevant part, 18 U.S.C. § 3624(c) authorizes the U.S. Bureau of Prisons (BOP), to the extent practicable, to assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed twelve months of the last 10 percent of the term, to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry to the community. However, as a Salvadorian citizen, Ms. Corado is likely to be transferred directly from the BOP to U.S. Immigration and Customs Enforcement's (ICE) custody following her BOP sentence to await immigration proceedings. And while she is currently a Legal Permanent Resident, there is no question that this case may jeopardize that status. The District of Columbia Circuit has recognized that a departure may be appropriate for non-citizens without lawful status in the United States because the Bureau of Prisons' regulations provide for differential treatment for these inmates. *See United States v. Smith*, 27 F.3d 649, 655-56 (D.C. Cir. 1994) (stating that departure "may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence"). Additionally, courts in this district have routinely reduced sentences on this basis. *See, e.g.*, *United States v. Rodriguez*, 676 F.3d 183, 192 (D.C. Cir. 2012) (explaining that "[t]he [district] court itself noted that it "normally" reduces the sentence of a deportable alien by six months under *Smith*").

Beyond the collateral immigration consequences Ms. Corado faces, her status as a transgender woman ensures that any period of incarceration will be uniquely harsh in ways that bear directly on what constitutes "just punishment" under § 3553(a)(2)(A). Courts have long recognized that when a defendant will suffer atypical and fortuitous hardship in custody, a downward variance is appropriate because a

term of imprisonment will be more severe "in kind and degree" than for the average or typical defendant. That principle applies with particular force here.

For Ms. Corado, these risks are not abstract. She is a transgender woman who has survived repeated sexual violence, homelessness, and profound trauma. In custody, she would face a materially heightened risk of sexual victimization, misgendering, degrading searches, denial of medically necessary care, and placement in restrictive housing under the guise of "protection." Such conditions would exacerbate her trauma and impose a punishment far more severe than the Guidelines contemplate for wire fraud.

The government may argue that constitutional standards remain in place, but § 3553(a) does not require this Court to gamble with a defendant's safety in the hope that post-hoc remedies might someday be available. The statute empowers the Court to account now for the real and foreseeable conditions of confinement when determining what sentence is sufficient, but not greater than necessary.

When Ms. Corado's transgender status is considered alongside her non-citizen status—foreclosing meaningful re-entry programming and virtually guaranteeing immigration detention and likely removal—incarceration would be uniquely punitive in both kind and degree. A sentence of time served, together with the severe collateral consequences she already faces, is sufficient to reflect the seriousness of the offense, promote respect for the law, afford deterrence, and protect the public, without subjecting Ms. Corado to a foreseeable and extraordinary risk of harm.

**E. Promotion of Respect for the Law, General Deterrence, and Avoiding Disparities**

The government contends that a substantial term of imprisonment is necessary to send a message and avoid unwarranted disparities. But unwarranted disparity is measured among similarly situated defendants. Ms. Corado is not similarly situated to the defendants cited by the government. Few face the combined realities of transgender status in a system retreating from safety protections, certain immigration detention, and likely removal to a country hostile to their very identity. Accounting for those differences does not create disparity—it fulfills § 3553(a)'s command to impose an individualized sentence.

Nor is deterrence served by imposing a sentence that ignores the extraordinary punishment Ms. Corado already faces: loss of her life's work, public disgrace, the certainty of immigration custody, and the looming prospect of exile. These consequences carry profound deterrent force. The Court can promote respect for the law by imposing a sentence that is firm, principled, and humane, rather than reflexively equating deterrence with additional months of incarceration.

## IV.    Sentencing Recommendation

The Judiciary Sentencing Information (JSIN) data referenced in the Presentence Investigation Report notes that during the five fiscal years (FY2019-2023), there were 693 defendants whose primary guideline was §2B 1.1, with a Final Offense Level of 18 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 621 defendants (90%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 19 month(s) and the median length of imprisonment

imposed was 18 month(s). For all 693 defendants in the cell, the average sentence imposed was 18 month(s) and the median sentence imposed was 18 month(s).

Here, there are compelling mitigating factors, including not only Ms. Corado's lack of criminal history and exemplary community record, but also the extraordinary life circumstances described herein, including the certainty of unique subjection to unwarranted hostile and dangerous treatment in BOP.

A sentence of time served, based on Ms. Corado's individualized circumstances, would avoid unwarranted disparities and fulfill the purposes of § 3553(a) without imposing  a sentence greater than necessary to achieve the purposes of sentencing, while accounting for Ms. Corado's particular history and characteristics, and the extraordinary collateral consequences she faces.

Respectfully submitted,

RUBY CORADO
By Counsel

/s/ Pleasant Brodnax
Pleasant S. Brodnax, III
1701 Pennsylvania Avenue, NW
Suite 200
Washington, D.C., 20006
(202) 462-1100
pleasant@pleasantbrodnax.com
www.pleasantbrodnax.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was filed by CM/ECF on the 6th day of January 2026, which will send a notification of such filing (NEF) to all parties to this proceeding.

/s/ Pleasant Brodnax
Pleasant S. Brodnax, III